## Illinois Steel Company v. Joseph Swiercz.

### Gen. No. 13,270.

1. MASTER—*when liable for injury to servant.* A servant taken from his regular work and peremptorily ordered to perform other work, in the execution of which he is injured, is entitled to recover if he was in the exercise of ordinary care for his own safety and was injured by reason of a danger of which he was not aware and which it was not within the line of his employment to anticipate and guard against.

2. NEGLIGENCE—*when burden to rebut, upon defendant.* The burden of showing that an accident was not the result of the defendant's negligence is upon the defendant where an accident occurs which in the ordinary course of events would not have occurred without the absence of due care on his part.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the Hon. LINUS C. RUTH, Judge, presiding. Heard in this court at the October term, 1906. Affirmed. Opinion filed July 1, 1907.

**Statement by the Court.** This is an appeal from a judgment of the Circuit Court of Cook county for

$2,800 in favor of the appellee, who was plaintiff in that court, against appellant, who was defendant there.

The declaration in the cause was in two counts. In the first count it is charged that the defendant operated a rolling mill and had employed the plaintiff as a common laborer for hire; that the plaintiff's duty was to do everything in and about the said establishment that said defendant directed him to do; that among other things, the plaintiff was ordered by the defendant to unfasten or uncover a certain mold which contained metal that had been molten and in a liquid form, and which had a cover or lid secured to said mold by iron bands; that at the time the plaintiff was ordered by the defendant to uncover said mold, the defendant knew that its contents were in a heated and explosive condition, and were not sufficiently cooled, or by the exercise of reasonable care and diligence could have known thereof; that defendant knew of the danger in uncovering said mold under such conditions, or by the exercise of reasonable care and diligence could have known of the danger therefrom; that plaintiff did not know of said danger in unfastening or uncovering said mold; that it was the defendant's duty to warn the plaintiff of said danger; that defendant negligently failed to warn the plaintiff of the danger and negligently ordered the plaintiff to unfasten the cover of said mold without warning the plaintiff of the danger; that while the plaintiff was unfastening the cover from said mold in obedience to the order of the defendant, and was exercising all due care and diligence for his own safety in this behalf, the molten contents of said mold exploded and forced themselves up with great force, striking the body of the plaintiff and severely and dangerously burning and injuring him.

In its second count the declaration charged the same matter, but alleged somewhat more particularly that the negligence of the defendant consisted in negligently, carelessly and wrongfully failing to warn the

plaintiff of the danger in unfastening the mold when its contents were in a heated and explosive condition, and in "negligently, carelessly and willfully ordering the plaintiff to unfasten the cover of said mold while the contents therein were in a heated and explosive condition."

To this declaration the defendant pleaded the general issue. A trial before a jury resulted in a verdict for the plaintiff for $2,800. A motion for a new trial and a motion in arrest of judgment were overruled and judgment entered on the verdict. From this judgment the defendant appealed to this court and has assigned for error and argued these propositions:

First. That the verdict is without any support in the evidence, and that the cause should have been taken from the jury by the trial court, on the motion made by the defendant at the close of all the evidence for a peremptory instruction for the defendant.

Second. That at all events the verdict was against the weight of the evidence, and a new trial should have been granted for that reason.

Third. The trial court committed a fatal error in giving the jury the following instruction at the instance of the plaintiff:

"The court instructs the jury that if you believe from a preponderance of all the evidence in this case, that, while the plaintiff was at work for the defendant company, he was ordered or directed by a boss or foreman of the defendant company, who had authority to represent the defendant company, to proceed with certain work, the performance of which was attended with danger, and if you further believe that while attempting to carry out the said orders or directions the plaintiff was acting with a degree of prudence or care which an ordinarily prudent man of his age, knowledge and experience would exercise under the circumstances then the plaintiff is entitled to recover, even if he had knowledge of the danger which attended the work in which he was engaged, under such orders and directions."

KNAPP, HAYNIE & CAMPBELL, G. H. CALL and WILL-
IAM BEYE, for appellant.

N. L. PIOTROWSKI and CYRUS J. WOOD, for appellee.

MR. PRESIDING JUSTICE BROWN delivered the opinion
of the court.

The contention of appellant that there is in the rec-
ord in this case no evidence which tends to support
the plaintiff's case is not well taken.

The plaintiff was injured December 30, 1902, while
working in the converting mill of the Illinois Steel
Company at South Chicago. He had been a workman
of the company for a number of years.

The molten metal after it came from the converters
was poured into a ladle and from this ladle poured
into molds which rested on small cars which ran upon
a narrow gauge track north and south through the
mill. On either side of this track was a platform upon
which the men stood while pouring the metal into the
molds and while capping the molds. The molds were
hollow and about six feet tall, the interior showing an
opening about two feet square. After the metal had
been poured into molds (if it were soft steel), a cap
which was in form a plate was put on top of the molds,
and held in position by means of a bar which was
passed through ears on the side of the mold at the
top.

The metal was poured in heats. A heat consisted
of sufficient metal to fill three of these molds. One
mold of soft steel would be filled, then capped, then,
by means of an automatic arrangement, the car on
which the mold was standing would be pushed north
upon the track and an empty mold standing upon
its car would be brought into position to be in turn
filled. The second mold would then be filled, capped
and pushed to the north like the first mold, and the
operation would be repeated with the third mold. The
three molds then were allowed to remain untouched

for a short space of time—several minutes—upon this track, so that the contents should cool somewhat. If they were opened too soon the molten mass of steel would explode, as it did in the present case, and spout out of the mold to the great danger of persons working on it.

After the period of cooling was over, the caps of the molds would be removed and the molds carried still farther north outside the mill, where the molds themselves would be removed, leaving the ingot of steel standing on the cars.

On the platform before spoken of there were stationed men, among whose duties it was to scrape or chip off from the mold any scrap or slag which, when the metal was poured into the molds, ran over the top and adhered to the sides, and who were therefore known as "chippers." This "chipping" was necessary in the molding of rail or hard steel, but caps were not used on such molds. A "chipper," however, had also the duty of assisting in "capping" in the case of soft steel molds, and the duty also of uncapping the molds after they were sufficiently cooled.

After a mold was filled there was sometimes metal left in the ladle, which was dumped by the side of the railroad track and became "slag." It was the duty of a laborer who was known as a "slagman" to clean up this slag and place it on other cars on the same railroad track, by which cars it was removed.

The plaintiff had been for several years such a slagman. This was his regular work. When a "chipper" or "capper" was off for any reason, it was the custom to call up the first slagman from the track below to take a place on the platform and assist in the "chipping," "capping" and "uncapping." The plaintiff was so called on the afternoon of December 30, 1902, the day of the accident. He had before been placed in the same position. The frequency of this occurrence is somewhat in dispute between the witnesses.

The plaintiff himself testified that he "had chipped prior to that time, perhaps two or three times in the month," and we understand a further answer, on cross-examination (he spoke somewhat obscurely at times through an interpreter) to mean that he had done this work but a few times. It is at all events conceded that this was not his regular nor usual work, but that he was, as it were, a "stopgap" or "make-shift" when he was about it.

The plaintiff's story on the witness stand concerning the accident was, that on December 30, 1902, he had been called upon during the day to act as a chipper, and was so acting at about half past five in the evening; that there had then just been made what was called a "heat" of soft steel; that is, enough to fill three large molds. The molds had all been filled and capped as described and left to cool. They did not need "chipping," this being unnecessary on the large molds, at least on these particular molds of soft steel. The plaintiff had been chipping during the afternoon, however, the molds of rail or hard steel which had been filled. The superintendent of the department where the plaintiff was working was Thomas Moore. The plaintiff was under his orders. The plaintiff testified that Moore gave him a specific and hurrying order to uncap the mold from which he was injured. Thus in his first account of the accident in his testimony, he says: "They were filling molds called soft steel, and Superintendent Moore called me to those molds and told me to knock them off, and while I was doing that I was hurt." Again, a little further on: "The superintendent called me and told me to uncover that mold. Then I uncovered the first and second one and on the third one I was burned." Again, being asked "When the superintendent told you to uncover those molds, have you told us all he told you?" he answered, "All he told me was, come on here and take hold of this hammer here and uncover these molds, and do it quick."

On cross-examination the plaintiff swore: "Just as soon as he (*i. e.* Moore) came there he simply told me to take hold of the hammer and hurry up and knock off the caps. He stood by me when he called me there to do this work."

He was further interrogated by counsel for defendant, and as he had been testifying through an interpreter, was asked to give the English words that the Superintendent Moore spoke to him. He answered: "Come on, Joe, hurry up, take the sledge and open that heat quick. I want bars for another heat."

The plaintiff says that he did not know how long these molds had been filled; that when they were being filled he was "chipping" molds that had had steel in them. He said again, "I don't know anything about how long they were filled before I got hurt. I didn't bother myself about that."

It is needless to go further. If the mold had not been long enough filled to make it safe to open it, if it was not the duty or business or in the line of the duty or business of the plaintiff to keep tab on the time it had been left to cool, and if the defendant, who had called the plaintiff from his regular work, gave to him through its superintendent a peremptory and hurrying order to open the mold, in executing which order the plaintiff was injured, the defendant was certainly liable for the result. All these conditions we think are explicitly or implicitly involved in the testimony of the plaintiff "with all its reasonable inferences and intendments." Woodman v. Ill. Trust & Savings Bank, 211 Ill. 578-581.

Therefore the motion of the defendant to take the case from the jury was rightly denied.

The contention that the verdict was against the weight of the evidence, and that the court erred in refusing a new trial, rests on a different basis, for the story of the plaintiff was denied by the superintendent, Moore, in its essential particular of a peremptory order. Moore's version of the conversation

he had with the plaintiff was that he came up, saw the plaintiff standing there, asking him if everything was all right, received no reply but a shrug of the shoulders, and went away without any further words before the plaintiff had uncapped even the first mold. Moore also testified that he had worked as superintendent for ten or twelve years, that he "had found out pretty well from practical experience" the length of time it required for the molds to cool enough to be safe to open; that "ten minutes *or over*" was sufficient time; that it had been "the custom" to leave the caps on for ten minutes; that there was danger in uncapping soft steel molds; that the contents would flow over the top if the caps were removed too soon; that such accident had occurred before; that he did not think that the uncapping of the mold in question was dangerous when it was done, because he thought from his experience that a sufficient time had elapsed since it was filled; that that time was more than ten or twelve minutes; that he knew this from the fact that he noted by the clock in the room the time when the last heat was poured, and he then left the mill, and "it was some ten or twelve minutes after" when he got back, and that it was after his return that he spoke to the plaintiff and asked him if everything was all right.

Relying on this evidence, the appellant claims, first, that the peremptory order which the plaintiff swears to is disproved, and second, that even if the order be conceded, the negligence of the appellant or of its superintendent is negatived because the time allowed was sufficient as viewed from the practical experience of the superintendent.

We say that the contentions of the appellant in this regard are made in reliance on this evidence, because, although other witnesses were produced by the defendant as to the occurrences at the time of the injury, a careful consideration of their testimony shows us that they corroborate neither Swiercz nor Moore in the conflicting parts of their testimony.

Thus Willis testified that Moore was at the place of the accident a minute or so before it happened, and that he didn't know what Moore said to plaintiff; and Zolskowski said he did not know who told the plaintiff to uncover the molds.

We think that in this state of the testimony the jury were at liberty to believe the story of Swiercz and disbelieve that of Moore and render their verdict accordingly. It is implied at least in Peaslee v. Glass, 61 Ill. 94, that as between the conflicting and uncorroborated stories of plaintiff and defendant (or the representative of defendant) the jury may, in the exercise of their function of passing on the facts, give effective credit to the story of the plaintiff. It does not strike us that the probabilities are with Moore rather than Swiercz as to the hurrying order. The words said by Swiercz to have been used were such as might well have been spoken under the circumstances by an energetic man in a hurry and not quite cautious or prudent; while it is difficult to understand why he should have asked the question, "Is everything all right, Joe?" and then gone away without receiving an answer or following up the inquiry with an order.

If the jury believed the testimony of the plaintiff in relation to the order, it was also within their right to refuse credence to the testimony of Moore as to timeing the heat. It was somewhat indefinite at the best. Although ten minutes was spoken of as a time for cooling sanctioned by experience, Mr. Moore modified that statement on cross-examination by declaring that "ten minutes *or over* was sufficient time to let the steel stand in the molds"—the alternative certainly making the answer a very safe statement.

Again, while Moore testified that he "timed the clock" when he left the mill, and that when he looked at the clock on his return he knew that the steel had been in the molds long enough to be safe, he did not give any precise statement of the time either of his departure or return. If he had been carefully watch-

ing the time, it must have been impressed on his mind by the occurrence of the accident. He contented himself, however, with saying that he returned to the mill and spoke to the plaintiff "ten or twelve minutes" after leaving it.

The unyielding facts remain that the steel was not cool enough to be safe, that it blew off because of its dangerous condition, and that no cause is suggested or can well be conceived for this, except that it was not allowed to stand long enough to cool. We think that the case comes under the class of cases spoken of and cited in Glue Company v. Wietzychowski, 125 Ill. App. 277, where, without invoking the principle *res ipsa loquitur* in favor of an employe, it can nevertheless be said that the mere fact of the occurrence of the accident indicates negligence on the part of some one. The accident was one which in the ordinary course of events, without some absence of due care, could not happen, and as it did happen the burden was put on the party responsible for such care to show that it was not the result of his negligence.

We should not feel ourselves justified in reversing the judgment as against the weight of the evidence.

The final contention of the appellant is that the instruction to the jury set out in the statement prefixed to this opinion was erroneous.

The argument of appellant is that the instruction authorized a recovery if the jury found that the superintendent gave the alleged order, even though the jury should not have found that such order was negligently given. In other words, it is insisted that the jury were precluded from finding for the defendant, although they might believe from the evidence that its superintendent as well as the plaintiff were in the exercise of due care and the occurrence was an accident pure and simple.

Although this is an instruction which attempts to state the necessary grounds of recovery, and must

therefore state them all, it is proper in construing it and passing on its accuracy, to consider also the other instructions with which it formed a series, stating together the law of the case. The jury by other instructions in that series were plainly told that the fact alone that the accident happened was not evidence of the defendant's negligence, also that if the plaintiff's action in uncovering the mold when he did was voluntary and without the specific direction which he alleged, then the defendant could not be held liable. Then they were told that the mere fact that the defendant, by its superintendent or foreman, directed the plaintiff to open the mold in question, was not sufficient to sustain a finding in plaintiff's favor unless they further found from the evidence that the superintendent or foreman giving the particular direction in question knew, or by the exercise of ordinary care, might and could have known of the dangers resulting from opening said mold at the particular time plaintiff did open it.

These instructions so clearly stated the law to be as the defendant claimed it to be in these particulars, that we do not think that the instruction complained of could have been construed or misconstrued to the detriment of the defendant. There is hypothetical negligence involved in it, namely, an order or direction to the plaintiff by a boss of the defendant company to proceed with work when and where such proceeding was attended with danger. That the liability of defendant for specifically ordering dangerous work in a dangerous place is not avoided merely by some knowledge of a plaintiff of such danger, is the proposition intended to be presented to the jury by the instruction. That proposition is supported by the cases cited by appellee; such as Illinois Steel Co. v. Schymanowski, 162 Ill. 447; Gundlach v. Schott, 192 Ill. 509; Illinois Steel Co. v. McFadden, 196 Ill. 344; Slack v. Harris, 200 Ill. 96; Hartrich v. Hawes, 202 Ill. 334;

Springfield Boiler Co. v. Parks, 222 Ill. 355; and many others.

Believing that in this case substantial justice has been done, we affirm the judgment of the Circuit Court.

*Affirmed.*